Thank you. Good morning, your honors. May it please the court. Elizabeth Richardson Royer on behalf of Gregory Bolin. I plan to reserve six minutes for rebuttal but I will keep an eye on the clock. Okay and if Bonnie can start the clock. There we go. Mr. Bolin has now spent 25 years incarcerated for a murder he did not commit. His conviction was based upon two pieces of deeply flawed evidence. An identification produced through a wildly suggestive show-up procedure and a DNA test of contaminated hair recovered from the victim's body which permitted no conclusion to be drawn about that hair's donor. This is the kind of evidence that produces wrongful convictions. This is a wrongful conviction but this court even under AEDPA can finally correct these injustices by granting Mr. Bolin habeas relief. This morning I planned to first address the eyewitness identification claim and then the ineffective assistance of counsel claim concerning the DNA evidence although of course I will be happy to answer any questions about any claims. You know I wouldn't mind if you were to begin actually with the certified issue which is to say I'll call it the Rhines issue. Sure. Happily. The district court abused its upon a standard that has since been firmly rejected by this court Blakey Baker. The district court did not consider whether the ineffective assistance of state post-conviction counsel could constitute good cause for Mr. Bolin's failure to exhaust because it concluded the good cause had to come from an external source beyond the mere acts of counsel which the court concluded Mr. Bolin was bound by. By applying this improper standard the court abused its discretion. It never reached the second or third prongs of the Rhines question. Can I ask you a question about that and that is as I read or reread Blake it was Judge Tashima's opinion but I was on the panel and that in Blake we decided only issue number one under Rhines that is to say whether or not there was good cause for the failure. We did not reach either two or three number two being whether or not an exhausted claim or claims were potentially meritorious. As I look at number one that is to say whether it was their good cause Blake clearly says that we look to Strickland for determining ineffectiveness. Do we look to Strickland for any degree of prejudice or for only look to what's number two in Rhines itself and that is to say the potentially meritorious nature of the claim? I think that those two inquiries are tied up with each other. If the claim that state post-conviction counsel failed to raise is plainly meritorious there is no prejudice from the failure to raise it but but the prejudice that occurs is the lack of these claims. So there is a sort of prejudice inquiry in the good cause determination but it's a relatively low bar because of the plainly meritorious standard. You see I'm not sure I even agree with you as to that as I read Blake it says we look to the the deficient performance but Blake didn't go beyond that in terms of incorporating Strickland and it left numbers two and three potentially meritorious and dilatory tactics specifically saying those are not in front of us. As I would read both Blake and Rhines the prejudice inquiry is only number two that is to say is a potentially meritorious claim. I think we essentially agree your honor that the prejudice whatever prejudice inquiry there is is encompassed within the second prong of Rhines and in Blake v. Baker the court remanded in Dixon v. Baker this court reached all three prongs and didn't remand. So that's what I would ask the court to do here rather than remand to the district court to have another chance to decide. And then one last question of the there are a whole lot of claims that were not made by post-conviction counsel. In order for there to be an abuse of discretion with respect to Rhines is it necessary that more than one of them be potentially meritorious or is it enough that there be one? And if we then say okay the stay was wrongfully denied when the petitioner goes back to the state court to exhaust may it exhaust all of the unexhausted claims whether or not they were potentially meritorious in our view or did we have to decide they're all potentially meritorious in order for them to be raised in the state court pursuant to the stay? The petitioner can raise any and all unexhausted claims before the state court. This court's determination on whether a claim is potentially meritorious doesn't have any bearing on what the petitioner can do in the state court. Let's assume arguendo that we decide to send the Rhines issues back to the district court. Should we defer determination with respect to the two uncertified issues in this case if the district court will of course also be dealing with lots of other uncertified issues? No, your honor. I believe that these claims are fully briefed. They've been amply briefed. They are ready for decision. They are going to have to be decided by this court at some point. So whether the court sends it back for a stay they're going to have to be decided unless the one of those issues, one or the other, wouldn't that give them full relief? Why would you even bother with Rhines at that point? Exactly, your honor. And that's my point is that there is no need for this court to reach the issue of whether the stay was improperly denied if it grants relief on either of the other uncertified at this point guilt-based claims. And these claims are ready for decision. Sending it back to take up judicial resources, resources of the government agencies in exhausting these claims is a waste of everybody's time and resources when these claims are ready for decision now. And if they disagree with you on either of the two uncertified issues that are before us, then we thought they had to go back on Rhines and would still go back on Rhines. Is that right? Exactly right, your honor. The two uncertified claims should be decided now. And if they, if relief is granted, there's no need to reach the Rhines issue. And if relief is denied, then the court has to decide the Rhines issue. Let me ask you this following up on Judge Fletcher's question. If it does, if we were, if we were, I'm just assuming the purpose of this discussion, to decide to send it back to the district court on the Rhines issue, what would the, what would the district court have to decide? Well, my position is that this court should decide that all three of the prongs of the Rhines test have been satisfied in this case. So it should send it back, you know, assuming relief is denied on the two other claims, it should send it back with instructions for the district court to grant the stay. You know, what the court has also done, I think in Jackson v. Roe, was send it back to the district court to consider good cause for the appropriate standards. Let me, let me, let's just assume for a minute that we just agreed with you on the Rhines matter, and we send it back to the district court. Even if we tell the district court, grant the motion and give Boland a chance to file his, his state habeas petition. And it comes back to the district court, let's say the Nevada Supreme Court denies all relief. Then what do we, do we just wait for the district court to then decide those claims when he gets to file an amended petition? If, do you mean if the court declines to reach the other two claims today? Yes, yes. Then we would have to wait for the district court to decide the claims that have, have then been exhausted. And then, you know, assuming that relief were denied, it would come back to this court and the court would then be looking at the same claims that are properly before it now. Then we would be looking at everything altogether. Right. All, every, every, every claim that's been exhausted. Exactly. Or there might be procedural bars in the ones that are going back late. There might. And, and just the, the time that would be consumed. Right. Okay. Thank you. All right. I'm, we, I'm afraid we took you about nine minutes, nine minutes of your time on Rhines, and you didn't want to start there. Would you, would you like to get to the issues you started with? That's absolutely fine, Your Honor. And if the court has no other questions on the Rhines issue, I will turn now to the eyewitness identification claim. Mr. Boland, Mr. Boland's right to due process was violated by the introduction of Keith Stierbaum's identification, both because that identification was produced in a wildly suggestive manner, and because the, all of the factors identified by both case law and science point to that identification's unreliability. Well, let me, let me, let me ask you this. The, even if I assume arguendo that you are correct about the identification at that time, Mr. Boland was being brought in because other evidence, for example, the video at the video store, the, the sister's comments, Mr. Boland's father's comments, interviews with him, screwdriver in the truck, et cetera, et cetera. He was being brought in because he was going to be charged, very likely. What, isn't this harmless error? Even if you're right about the show of suggestiveness, what difference does it make? He, they had evidence to show that he was involved in this crime. Now, whether, whether the testimony of the eyewitness would have been believed by the jury is another matter. That's the weight of the evidence. But in terms of that this was, the person seems to me a little bit strange because they're, because of other evidence that, and we decide this based on the totality of the evidence, do we not? The, the totality of the circumstances standard is what the court looks at in determining reliability. But the court and the Supreme Court in Manson versus Frank White made this clear in determining whether the due process violation occurred because of the admission of eyewitness identification. We don't look at the other evidence. Well, let me, let me, let me make sure I want to, I want to be sure that we're talking about the same thing. Let's assume, arguing on that, so I'm not saying it's what's true in this case. Let's assume that Mr. Boland, based on what he said in the interview, what his father said, what was otherwise shown, that there was more than enough evidence to convince a jury that he had committed the murders and so on. And then the show-up evidence occurred. Wouldn't the show-up evidence basically be harmless because there's enough evidence otherwise to convict your client in that hypothetical? No, Your Honor. Respectfully, and I sort of have two responses. The first is that it's not actually the standard. The standard for harmlessness is whether the evidence had a substantial or injurious effect on the jury's verdict. And when you look at this really damning identification versus the relatively weak other evidence of guilt, I don't think there's, there's any way to say that that evidence didn't impact the jury's verdict. The only other response, you know, that, that I want to make right away is to point out that respondents did not raise the issue of harmlessness below. It's my position that they have waived this issue. And this court has, in numerous cases, declined to find a constitutional error harmless where it's been waived below. And that's the case here. And even if not waived, the Nevada court didn't reach it. So if we do reach it, it's de novo to us on harmlessness. That's exactly right, Your Honor. If the court reaches the issue, it's de novo. And given the, you know, the relatively scant evidence against Mr. Boland, which really came from this, this contaminated inconclusive DNA test and this eyewitness identification, I don't think there's a way to find that this couldn't have impacted the jury's verdict. But we know, oh, go ahead. I'm sorry. But let's assume that this identification had never occurred. But later on, the eyewitness came and testified based upon what he remembered. The jury would be entitled to hear that, would it not? If Mr. Cierbog had not been prompted by a suggested procedure to make an identification and he came and identified Mr. Boland, that would not be a problem. But what we know about the way that eyewitness memory works is that once a suggested procedure has occurred, there is no curing that error. That memory has been destroyed. It has been tainted. And that's what happened here. But isn't that what a good defense lawyer does? And you had an expert in here that talked about the lack of reliability of eyewitness testimony. A defense lawyer will attack what was seen and the identification question. But what I'm and I would appreciate your help on is even if there was error in the stand-up, basically, this guy was a witness. He saw the tattoo. He saw the good athletic field, et cetera, et cetera. And he was known to be the person who called the police in the first place. He was tied in. He was going to be involved in the Why doesn't it just go to wait, something that the defense attorney would attack, rather than basically throwing the whole thing out based upon what may or may not have been suggested? I think, you know, if, and this is a balancing test, and if his identification remained reliable enough to outweigh the suggestiveness, then that is exactly what would happen at trial. And his testimony would be subject to cross-examination. But the Supreme Court has made clear that there can be a level of suggestiveness that so outweighs the reliability that it violates due process. And that's true whether this should have been a good witness or not. You know, and in this case, it was the police's fault that this witness's testimony became problematic. If they had not done this suggestive procedure, he could have done just as your Honor suggests, and he could have gone and saw. Was there any necessity for this procedure? There was not, your Honor. There was, you know, Keith Stierbaum told Sergeant Heffner that he needed to see something more than a photograph. He needed to see the way the suspect moved. He needed to be able to see the suspect's body type. And those are things that can be accomplished with a lineup. Those are things that can be accomplished, you know, easily in a standard lineup. And the detectives in this case did not try to do that. There were photographs that they easily could have presented in a photo array, and there's testimony at trial about this. And they didn't even try to find them. Sergeant Heffner said... Let me, can I make just a step or two? Does your argument turn on whether there was an unreasonable application of clearly established Supreme Court law barriers in the other cases following, in that line of Supreme Court cases? Or is it both? It's both, your Honor. What's the unreasonable determination of facts? There were several. The state court unreasonably found that the identification occurred before all of these booking-type activities took place, which is just not true. Sergeant Heffner would not have asked Cierbag after those activities, is this the guy or not, if he'd already identified him. Sergeant Heffner, you know, made clear that he was frustrated by Cierbag's inability to identify Mr. Boland, and that's why he decided to, quote, do what we needed to do. There was no identification before those proceedings took place, and the state court's contrary determination was unreasonable. The state court also unreasonably found that the identification occurred without prompting, which is a determination that's flatly contradicted by the record, which showed Sergeant Heffner prompting Cierbag every step of the way. And the final unreasonable determination of fact was the state court's determination that the description of the suspect matched Mr. Boland's appearance, which it didn't in many important ways. Height, weight, skin color, age, clothing, I mean, there were all of these differences that were just ignored by the state court. And is that unreasonable determination of fact essential to your argument? None of them are, Your Honor, because the court could also and should also find that the state court's decision on suggestiveness was contrary to clearly established federal law in Foster, in Grapewhite, in Biggers, you know, in all this line of cases that set forth what would be suggestive, a one-on-one show-up, telling the witness that progress has been made. All of these things that are present in this case, the Supreme Court has made clear that those factors are suggestive. So this court could find the state court's decision unreasonable under D-1 or D-2. I take your point that we could do either one. Coming back to the question of mistake of fact or unreasonable determination of facts, as I read the narrative, and it's quite a long narrative by the Nevada Supreme Court, they give what seems to me a pretty accurate narrative of what's going on. When Mr. Boland first shows up, at that point, the witness, is it Cirovaga, is that how I pronounce it, Mr. Cirovaga, there's a spark or a resemblance. And the Nevada Supreme Court says that accurately. It later says, well, when he identified him, but almost in that same sentence, the identification is characterized by the Nevada Supreme Court by spotting the resemblance. So I'm not sure that the Nevada Supreme Court is actually misrepresenting or misfinding the facts. It's calling the point at which he says resemblance, it's calling it identification. But it's pretty clear that what it's referring to is only the point at which he says there's a resemblance, rather than when he says, yes, I'm, you know, 70 to 90 percent sure that this is the guy. He doesn't say that, of course, until he's on the phone an hour later. So I'm not sure, as I read the Nevada Supreme Court, that I can really conclude that they've mischaracterized or misfound the facts. They use the word identify in an odd way. But as they give us the factual narrative, it's pretty clear that they say only that when he first shows up, when he's escorted in into the room by the officer, that there's a spark or a resemblance. The Nevada Supreme Court says that accurately. Well, even if the court doesn't agree with me that that's a factual determination, the other two unreasonable factual determinations persist, you know, that it was unprompted and that the description matched, and it was an record, do you suggest constitutes prompting that is sufficient to meet the case law? There are a number of places, and I will point you to them. Stierweg, in Sergeant Heffner, you know, there are several places where he said, is this the guy or what? He said, is this him? You'll have to tell us whether this is him or not. Okay, what's the matter with that? That's just a simple question. Is this the guy? If he said no, then that's the end of it. If he said, this is the guy, isn't that the guy, isn't that the guy, aren't you sure? But to ask the simple question when they brought him there to see if you can identify him, why is that a prompt that qualifies, rather is disqualifying under the case law? Well, you know, the instructions before the show of procedure were that Stierweg should notify them if he made an identification, and then he didn't. And so Sergeant Heffner told him, essentially, to do so. He said, is this the guy? What's wrong with that? He told him, you know, afterward, he said for him to call if anything came back. That's a perfectly logical thing. But he didn't say, you got to find that this is the guy, this is the guy, isn't it? He asked a logical, perfectly appropriate question, didn't he? Well, I don't see it that way, Your Honor. I don't think that we would have to have a detective saying, tell me this is the guy, you know, something to that level, in order to find prompting. Is this the guy? That's a question. I think it's a perfectly logical question, given the purpose of his being there in the first place. Well, I believe that, you know, in light of this show up that was happening and, you know, processing Mr. Boland, making him take his clothing off, measuring his tattoo, that the questions, the repeated questions about whether or not he was the suspect, and the pressure that Sergeant Heffner admitted putting on the witness, constituted prompting. But like I said, the court doesn't have to agree about these factual determinations, because the state court unreasonably applies Supreme Court precedent in finding that no police escorted Mr. Boland to have blood drawn, to be photographed, to line up against a wall in front of the eyewitness. This is suggestive under fairly established federal law. The question is whether or not it's unnecessarily suggestive. I've got a question that may be in the record, but I mean, there are a lot of pages and I read a lot of pages, but I didn't read everything. So maybe you can help me with something I was unable to discover. We know that Sherevog is escorted through the prison and invited to look into the holding cells, maybe six or seven holding cells, in which there are quite a few people in each one of the cells. He's warned ahead of time, well, you know, some of the prisoners may be dressed in officer's uniform, don't look at the clothing as necessarily, and so on. We know that. What I couldn't tell is whether or not your client, Mr. Boland, was in any of those cells so that he had an opportunity to identify him or get a spark of recognition at that time, or was the first time he was ever within the sight of Sherevog was when he was brought into the room. Do we know that? He was never in those holding cells. How do we know that? Detectives Tremble and Morgan and Sergeant Hefner testify about how Mr. Boland was brought. Tremble and Morgan, you know, waited in the sally port while an unidentified officer escorted Mr. Boland into the booking area and then had him linger there while Mr. Sherevog looked at him for up to five to ten minutes. No, I know that. I know that, but it's possible, maybe unlikely, and maybe I can't fully pin it down, that he had also been in one of the holding cells earlier. No, he hadn't. And I asked you, how do we know that? Because of the testimony of Detectives Morgan and Detective Tremble and Sergeant Hefner about executing the search warrant at Mr. Boland's house and then bringing him to the station, and then how he was brought into the station by the uniformed officer. There was no testimony about him ever being in the booking area, I mean, in a holding cell. In a holding cell, okay. So, assuming that that's right, that he was not in one of the holding cells, and that's certainly the way I read the record. I was trying to figure out if there's anything more that I hadn't yet seen. Everything you told me, I already knew. We're on the question of suggestiveness, but not just significance, but unnecessarily suggestive. It seems to me that a fairer procedure at the outset would have been to do, to have Mr. Boland in one of the holding cells. Instead of the only time, we said the only time it's a one-on-one. Instead of starting out with a sort of a makeshift lineup in the holding cells, which they pretended they were doing, that goes to me as to whether or not the way they did it was necessary. It strikes me as it was not necessary. It absolutely was not necessary, Your Honor. That's a very good way they could have done it. They also could have had officers bring other people into the booking area. There are innumerable ways they could have done it that didn't involve having a police officer escort Mr. Boland into a booking area and then proceeding to effectively book him. One of the things that, by the time of trial, the officers had been coached into not calling this a one-on-one show-off anymore. But in their initial statements and in their initial testimony at the preliminary hearing, they all called it a one-on-one. That's what they were trying to do. The Nevada Supreme Court called it a one-on-one. There's no question about whether or not the state thought it was a one-on-one. That's what it calls it. Right. And you're absolutely right that it was not necessary. You sought to reserve six. We've taken you down to two. Do you want to reserve two, and then we'll tack on a little bit to make sure you get a chance to respond fully? Yes, thank you, Your Honor. Ms. Perlick. Good morning, Your Honors. And may it please the Court, Jessica Perlick on behalf of respondents. Your Honors, I had intended to begin with the Rhines today, but I'm happy to begin wherever the Court would prefer. Why don't we get Rhines out of the way? It seems to me, speaking now only for myself, you lose on Rhines. Why do you win? I'm sorry. Can you repeat? I had a little trouble hearing you. Yeah. Speaking only for myself, at this point, I'm inclined to hold that you lose on the Rhines issue. Talk me out of it if you can. Your Honor, I don't believe we lose on the Rhines issue, because this is an abuse of discretion standard. Rhines requires a preliminary showing of good cause for a failure to exhaust a claim. And the U.S. Supreme Court specifically said that good cause effectively excuses the failure to present claims to the state first. What happened here was when Mr. Boland sought to stay, he gave very vague, broad, and generalized statements about why counsel was ineffective. In fact, all he said was post-conviction counsel was ineffective. That is why these... Did the district court apply the wrong standard? That is to say, a standard inconsistent with our later decision in Blake? I believe he would actually lose under Blake as well. No, I asked you a different question. Did the district court apply the wrong standard? No, the district court did not apply the wrong standard. It's just dead wrong. As I read what the district court did, it applied the same standard that the district court had done in Blake, which we reversed. The difference between... I think the key difference, Your Honor, between Blake and this particular... this case in particular, is that the defendant, the petitioner in Blake, did not make generalized statements. They pointed specifically to evidence and facts that supported their allegations and their argument. Yeah, but that's the application of the standard. The articulation of the standard, it strikes me, the district court got it wrong because it followed the articulation of the standard as the district court in Blake had done, which we quite straightforwardly reversed. The district court in Blake made a categorical statement that post-conviction counsel's performance can never establish cause. The court here at least acknowledged that post-conviction counsel can establish cause, but simply that Mr. Boland failed to demonstrate that it established cause in this case and under these circumstances. Let me ask you the same question that I asked the opposing counsel. If the court is inclined to remand the Rines issue back to the district court to apply the more recent law to its decision, should we defer determination of the two uncertified issues in this case until the district court addresses the Rines stay? I believe that Your Honors could defer because no certificate of appealability has ever been issued on the two uncertified claims, and so absent that, they're not technically before the court. However, if the court does issue the certificates of appealability for the claims, then relief could potentially be granted and the Rines stay issue would be somewhat moved at that point. Only if we were to agree with issues on appealing. I'm sorry? Only if we were to agree with the petitioner that the district court erred on the, say, the identification issue in the DNA. Correct. If the court were to grant relief on the uncertified claims, then the Rines issue would be moved. However, if the court does not grant relief, then Mr. Boland would still have the opportunity upon a remand to attempt to present exhausted claims at that time. If we think that either of the two uncertified issues is a close question, is it possible that those questions would look different after a Rines stay in abeyance, and then we maybe have a cumulative error issue that looks different? Potentially, Your Honor. If the court finds that these are close calls without, and that the lower court did not, if this court were to determine that these were close calls, then yes, they could potentially look different, but it depends on what the scope of the remand would be to the lower court and what Mr. Boland would be allowed to establish in a potential remand. Beyond attempting to go back to state court to exhaust claims. Let me ask you a version of the question I asked your opposing counsel. Assume that, for a moment, that we find that at least one of the issues that was not presented by post-conviction counsel should have been presented, and it was ineffective assistance to counsel in the sense of deficient performance for not presenting it in the state court system, and that under point two of the Rines test, it's potentially meritorious. So, there's one claim on which a stay in abeyance under Rines is appropriate. At that point back in the state court, does the petitioner get to present everything that's unexhausted, not just the single issue on which we found that the stay was warranted? Your Honor, I believe that the petitioner could do as he wanted to do in the state court and present whatever claims he sought to exhaust. The question would be whether the district court would be able to hear those claims. Well, once they're exhausted, I think the district court can, or am I missing something? If your Honor's remand, if the court's remand were limited to a single claim, then there may be a potential issue of whether the district court was allowed to consider additional claims. But if the scope of the remand were for any potentially later exhausted claims, I think that that changes the calculus. Why would we limit, if we would agree that there was a misapplication as correct standard on the Rines motion, why would we limit it to one potential unexhausted claim? I don't believe... I thought we would just send it back to the district court if we thought that was appropriate, and the district court would decide whether any issues we leave open under Rines, and then he can go back to state court and raise whatever claims he wants that are unexhausted. And I don't disagree with that, Your Honor. The district court says he got 35 days or 40, this is what we used to do. I remember doing this in a different way back when I was on the district court. But the question is, is he entitled to a Rines stay? And it looks like, as Judge Fletcher said, it looks like the district court applied the wrong standard. The district court did not have the advantage of blank when it made its ruling here. Correct, Your Honor. And perhaps I misunderstood the question. I believe that when Judge Fletcher was asking if we only look at the merits of a single claim and then tailor a remand to a single claim, that that was the scope of the remand. And perhaps I misunderstood that or read something into it that wasn't there, but I don't disagree that he could go back to state court to attempt to exhaust additional claims that he made. Come on, can I just ask you one final question in this area, and that is, why do we need to send back any of the Rines issues to the district court, given the context within which this good cause requirement is framed? That is, it's framed as ineffective assistance of post-conviction counsel. Because the district court didn't have the opportunity to consider whether counsel's met the standard of deficient performance. Mr. Boland's arguments in his motion for stay and motion for reconsideration did not articulate any basis to establish counsel's performance. And so with absent that, the court has never had the proper opportunity to consider deficient performance as it relates to how counsel performed in state court. So you're reading a pretty high standard under Blake. I'm sorry? You're reading a fairly high standard under Blake. I don't believe I'm reading a high standard into Blake. I believe Blake... Why is it focused just on whether or not there's a potentially meritorious claim, period, end of story? Because this court said that good cause is a threshold requirement to establish the right to a Rines stay. We have to balance the twin purposes of AEDPA, the finality of the conviction, along with encouraging the exhaustion of claims in state court. And in Rines, the Supreme Court said that granting a stay effectively excuses the failure to go to the state court first, which is why the good cause requirement is the first thing to establish. And because that wasn't the first opportunity to review that under the Blake standard, which says it turns on whether the petitioner set forth a reasonable excuse supported by sufficient evidence to justify the failure to go back to exhaust the claims. And that's why... Okay. I think I understand your position. I don't want to take any more of your time. Thank you, Your Honor. Now, as to identification, do you have a different answer from your opposing counsel with respect to whether or not Mr. Boland was in any of the holding cells when Siervag was taken past the holding cells? No, Your Honor. I agree with counsel that there is nothing in the record to establish that he was in a holding cell. And in fact, Keith Siervag's testimony at trial said that the very first time he ever saw Boland was when he was walking in the doors. Yeah, well, that's what Siervag says. But what I'd like to pin down is, I mean, that's the first time he saw him, or at least the first time he thought he saw him. But I'd like some tighter evidence that says he simply wasn't in the holding cells. I agree with counsel that the detectives did testify that he was not in a holding cell, but I also... Okay, that's enough then. Okay, so that's how I read the record, but I want to make sure I've seen everything that's to be seen on the question. So, the first time that he's in the line of sight of Mr. Siervag is when he's brought into the room by the officer. When he walks into the Clark County Detention Center, not handcuffed, in plain clothes. I understand. And so when Siervag was taken past all of the holding cells, Mr. Boland simply wasn't there, even though I guess it would have been possible for him to have been put there. Why is it then... I mean, it's clearly suggestive. And the question is whether it's unnecessarily suggestive. They had the option of doing a lineup, as it were, by putting him in the holding cell and see if he could have been spotted, but they didn't do that. Why not? Your Honor, I believe if we... I believe if we were in a situation where Mr. Boland were held in a holding cell, then the argument would be that that was unnecessarily suggestive because it would indicate that he was in custody. And because he was in custody, he was the person that law enforcement wanted identified. Well, that could easily have been taken care of. The officer could have said, now, we've got a lot of people in those holding cells. Some of them are actually in custody. Some of them are not. This is just for purposes of identification. They could have dispelled that, in other words. The officers did point out, prior to... prior to Syravag looking... Mr. Syravag looking at anyone, did point out that anyone could be anyone. Nobody should be considered in custody... should be... not to make any assumptions about any individual. So even with regard to when Mr. Boland walks in, that statement had already been made. I just think that for the purposes of this particular procedure, to... to put Mr. Boland in a holding cell along with other individuals would likely have been more suggestive. If anything, this was... this was not nearly as suggestive as that potential scenario because Mr. Boland walked in accompanied... accompanied by officers that had never been met by Mr. Syravag, but not in custody, not handcuffed, and in plain clothing. Well, but he's being booked. I mean, he is in custody. Of course he's in custody. But not obviously. He does not appear to be walking in on his own. I'm sorry. At the time... at the time that Mr. Boland was brought in to the station, what evidence of his alleged involvement in the crime did the police department have? The police had reviewed the surveillance video, I believe, by that point, which had... which had shown after speaking to the victim's sisters, and they had identified an individual who was Mr. Boland as the individual who was coming to the video... the video rental place that they worked, had asked them out on numerous occasions, demonstrated an interest in all of the sisters, and had come multiple times over a two-week period. And then after viewing the video... viewing the video, seeing and identifying Mr. Boland as the individual that the sisters were referencing, that was... that was part of what was already established. Had they... had they gone to his home at that point, his father's home? Your Honor, I don't... I don't... and I apologize. I don't recall in the timeline if they had gone to the home prior to bringing him in. I believe they did execute a search warrant, at which point they found the black tank top at his... at his home that he declined owning. There was a screwdriver that was covered with blood, apparently, that was in a truck that belonged to him. When was that found? The truck belonging to the victim, you mean? Yeah, no, I think the truck... well, perhaps I'm wrong. I thought it was the truck owned by Mr. Boland. Perhaps I'm mistaken. No, the truck... my understanding is that the truck was owned by the victim. Oh, okay. It was the truck that Mr. Seierbach saw at the construction site, a 1974 Chevy, primer gray in color, beat up in nature. That was the truck that was found a few blocks from Mr. Boland's home, containing the bloody screwdriver. I understand. And was that... was that found before he was brought in to be booked? Your Honor, I'm sorry, that I don't recall from the record. Okay. And had he... had they spoken to his father and Mr. Boland before he was brought in to be booked? They did speak to his father about whether... when Mr. Boland... whether Mr. Boland was home, at which point Mr. Boland... his father stated that he had left the night before and come back in the early morning hours. And I believe... They also interviewed Mr. Boland. Was that done before he was booked? I don't believe the official interview had happened, but enough of a sort of... They asked about... he mentioned two guys who didn't know their last names, who didn't know where the party was, that sort of thing. Right. They knew all of that before he was booked, right? Right. And in terms of... in terms of the identification, looking at the totality of circumstances, I would... I would submit that Mr. Seierbach's testimony, as Judge... would have been available to state to use, because Mr. Seierbach was, in fact, a witness and viewed someone at the job site, saw the victim... saw what was ultimately determined to be the victim's truck, and gave an identification... gave a description of the person who was seen leaving the body of Brooklyn Ricks. So I believe Judge Smith's point is well would have specifically identified Mr. Boland. His information identifying what the individual looked like and what the individual was wearing still comported with what Mr. Boland at least looked like and had been wearing... what he had been wearing. What other evidence linked Boland with the crime scene? With the crime scene itself? Yeah. Um, the... most of the evidence had been circumstantial. There was a... there was an errant hair, which was the subject of the DNA issue, but that was neither inculpatory or exculpatory in nature, which is what was... what was established for the jury. Now, in terms of Mr. Boland... No, it sounds like Seierbach's testimony was pretty... pretty central. His testimony as to what he witnessed, I believe, was essential, and that is... Or the identification. The identification was important, but I don't... in light of the other... when considering the totality of circumstances and considering all of the circumstantial evidence together, the picture that is painted is that this was an individual who had been shown to be interested in the victim, had interacted with the victim over... the victim and her family over the past few weeks, was seen wearing the same outfit on video that was later described by the witness of the person leaving the victim's body. And then the truck is found a few blocks away from his home. He does not have an alibi. He... Well, he does not, but it may or may not be believed, right? I'm sorry? He does have an alibi. It may or may not be believed. Right. He doesn't have a credible alibi, is what I intended to say. But he's also... he also misrepresents to law enforcement what his background is, what... whether he has a criminal record. He lies to law enforcement about whether he owns the type of shirt that is seen in the video. And so there were... and he does speak to a jailhouse informant about fingerprint evidence, but that is somewhat disbelieved by the jury. So that's not a key issue. But considering everything together, yes, Seierbeg's identification is important. And even taking the totality of circumstances under Biggers, that was an appropriately admitted identification. He had... Let's assume for a moment that the... I forget the gentleman's name, but Seierbeg, I guess, that Mr. Seierbeg had not been at the station when the defendant was brought in to be booked. And he was booked and later on the defendant had been put in a lineup and picked out then. Would that have cured all of the problem? Your Honor, it would have been... it would have been an appropriate procedure to employ, but I don't believe that the procedure here needs to be completely thrown out. I don't... I believe under the U.S. Supreme Court's precedents and their instructions under Biggers, we have to consider the totality of circumstances. And regardless of whether this court finds that the actual procedure itself was unnecessarily suggestive, the identification is still admissible if it meets the totality of circumstances. The Nevada Supreme Court didn't specifically refer to Biggers, did it? No, it did not. Did it apply the prongs of Biggers in its analysis? It did. It did apply some of the prongs. It didn't apply all of the prongs. And the lower court did apply an alternative de novo review to account for that discrepancy. And even under a de novo review, still denied relief. And I think that that's appropriate here where the situation involves Mr. Seierbeg appearing, driving up to his construction site in the early morning hours when it's light out. He's not intoxicated. He has nothing obstructing his view. He can view this individual for a total of 20 to 30 seconds, which comports with eyewitness identifications that have been upheld by the Supreme Court. He gets a good look not only at what the individual is wearing, but certain features of that individual, the clean-cut nature, his large muscular build, the tattoo on his right shoulder, upper right arm, and the black or dark-colored tank top, and the well-pressed, nice khaki shorts, which is what Mr. Seierbeg points out alerted him to the fact that this person was unusual to see on the construction site because he wasn't dressed as someone he would expect to see. So he did take note of the individual that he saw. Let me ask you the following question. This is an odd case. I've never seen one with quite this issue. If Mr. Seierbeg had not been allowed to say in the courtroom, that's the guy, but instead had only been allowed to say, well, here's what I saw on that morning, and here's the statement I gave to police. That's one case. That's not the way the case was tried. The way the case was tried was Seierbeg is asked, can you identify the guy? And he says, yes, he's sitting right there. If we take away Seierbeg's testimony as given and look only at the remaining evidence in the case, we might arrive at one harmless error determination. If we look at the case as it would have been permissibly tried by having Seierbeg only testify as to what he saw, but not making an affirmative identification in the courtroom, well, that's a different harmless error analysis. Do we do the harmless error based upon simply subtracting from the trial the impermissible testimony, or do we do harmless error by imagining what the trial would have looked like had the permissible testimony been presented, but, of course, it was not presented in that form? How do we do the harmless error analysis? Your Honor, I think the harmless error analysis requires that we're looking at whether the identification itself did have a substantial injurious effect. And so taking Mr. Seierbeg's testimony as given is appropriate, but still does not warrant relief. I believe... I'm not even sure I understand you. When you say take his testimony as given, you mean we take out the testimony entirely because it's impermissible? No, Your Honor. The purpose is a harmless error. For harmless... For a harmless error, I do believe you can look at the testimony that is simply about what he saw and omit the identification. I think that's within the court's discretion to do, because the... The identification... I'm sorry. His testimony regarding what he witnessed, not necessarily the identification, would still have been before the jury. He would have been a witness that gave context to the individual that was seen at the crime. So I do think that that can be an appropriate application of a harmless error analysis. Indeed, could he not, based on what he had said to the police, have said that, I believe that the gentleman there is the one I saw? That would have been perfectly permissible, wouldn't it? I would have been attacked by the defense, but he could have said that, could he not? Yes, he could have said that. Well, that's your argument. On the other hand, if we were to hold that the show-up were impermissibly suggestive, he couldn't have said that. Although, he could have said, here's what I saw. He was dressed in such and such. Here's the description I gave to the police. But he couldn't have said, and that's the guy. If we hold that the show-up is impermissibly suggestive, leading to the affirmative identification that he later comes up with. Yes. Can you restate your question, Your Honor? I'm not sure that I followed. Well, I think Judge Smith and I are, at the moment, in a tentative disagreement, or maybe we have different premises. I'm operating from the premise, for purposes of the question, that the identification, the affirmative identification by Sarovag that this is the guy, that that's impermissible because it was unnecessarily suggestive and had the potential for being misleading. So, if we take that assumption, then all he can testify is to, here is what I saw. He can't say, and that guy sitting over there is the guy. So, and maybe Judge Smith is assuming that we've decided that it's not impermissibly suggestive. Right. We're on the same page then. Yeah, yeah. Okay. I apologize, Your Honor. I just needed to, well, that was between Judge Smith and me. That's not your, that's not your fault. But he and I are now on the same page. All right. Thank you, Your Honor. What I would say, in addition, though, that all of this, all of this information regarding the type of procedure employed and Mr. Sarovag's certainty with the identification and any of the discrepancies were all put before the jury as well. So, just as an aside, the weight of the identification was assessed by the jury with knowledge of the entirety of the circumstances present. Yes and no. They didn't hear all the stuff beforehand in terms of the sequence of what he was at first quite uncertain. It was just a spark. It was just a resemblance. Well, he was in the station. He couldn't make the identification. He goes away and calls back and finally says, I can do the identification. The jury didn't hear that. They, actually, they did, Your Honor. In, on page 280 of the record, Sarovag testifies that he told Sergeant Hefner that he was interested in the man that he saw because there was a spark or resemblance. He also testifies that on 284 that there were similarities, but he was not 100% sure who the individual was. He then testifies on 285 that Hefner, that he called Sergeant Hefner about an hour after leaving the station to say he felt more sure and he was cross-examined about his level of certainty on page 393. And do we get the full flavor of the pressure that he was put under? Mr. Sarovag denied that he was under pressure because he pointed out that he was the one who, who saw Mr. Boland from the get, from the initial walk-in of Mr. Boland, that he was the one who identified him. He did not testify specifically about pressure that he may have felt. No, he denies pressure, but if we look at it from the other side, we look at the, we look at the police testimony earlier on as the judge is trying to decide whether or not to admit it, but the, the officers are testifying to some real pressure. I mean, that was their intent. Right. They say that that was their, they say that was their intent. And the bottom, but the bottom, bottom line is what, what you just recited to my colleague shows that the jury was informed about each of the concerns that my colleague had about the lack of initial identification, the callback later, and so on. The jury knew about all of that, right? Yes, your honor. The jury did know about all of that. And so if the court has no further questions, then I would submit that I would ask this court to affirm the findings of the district court. Thank you. Thank you very much. Judges and lawyer, you sought to reserve six minutes. Why don't we put six minutes on the clock? You're a very generous guy. Very generous. I wanted to, to touch upon a few factual points to correct a few misstatements and more importantly to answer Judge Fletcher's question about Mr. Boland being brought to the station to give you the actual record sites. Detectives Morgan, Detective Morgan testified about bringing Mr. Boland to the detention center and how he entered the detention center at ER 691 to 92. And Tremble testified about bringing Mr. Boland there at ER 870 to 71. And their testimony really makes clear that he went straight into the booking room, waited there until Sergeant Hefner said for the detectives to come inside. He was never in the holding cell. My opponent suggests that it would have been more suggestive to put Mr. Boland in the holding cell because as it was, he was not in custody. Mr. Searbeck thought he was in custody. When he was being driven home afterward by Sergeant Hefner, he said, how did you get the guy so fast? He saw Mr. Boland being photographed, being measured, being, you know, for all purposes, booked. He thought he was in custody. He didn't remember whether he was in cuffs, which suggests that he would not have been surprised if he had been. So that, that argument is just. Counselor, when someone is booked, isn't it customary for them to be photographed? Yes, Your Honor. And the photographs, photographs, putting aside for a moment, taking off the shirt, all of the photographs that I saw were pretty standard form photographs, were they not? They were not standard in the sense that they were produced, not actually in connection with booking, but as part of this one-on-one show up. So one of the factual distinctions I wanted to make is that Mr. Boland was not under arrest at this point. In fact, he was taken home after this whole proceeding and stayed there for two days until they were able to get a warrant for his arrest. So all of this was done, you know, to collect the seriological evidence, but the photographing was done and the displaying of his body at Seerbegg's request was done as part of the one-on-one show up. One of the other factual corrections I wanted to make is my opposing counsel suggested that Mr. Boland had shown an interest in the victim. He had never met the the night of the offense. The screwdriver was found in the victim's car. It was found half a mile from Mr. Boland's home, also within a very close distance to the video store and to the victim's home as well. So that evidence found is not inculpatory. I wanted to answer Judge Smith's question about what other evidence, or maybe it was Judge Hyatt's, about what physical tied Mr. Boland to the crime scene because there was none. There was no blood evidence, no physical evidence found on any of his clothing in his home, anywhere in connection with him. And the one piece of evidence that the prosecution relied on, I really wanted to talk about because I didn't get a chance to discuss the IAC claim with the court, and that is this foreign hair. Because the prosecution's position was that this tied Mr. Boland to the crime scene, but in fact it did not. The DNA profile recovered from the hair revealed that it was the product of contamination, and that contamination could have come either from Terry Cook's sloppy handling of the evidence. He testified that this is the criminalist who processed known hairs of Mr. Boland and this unknown hair, all of the blood samples, all at the same time. He later resigned from his handling DNA evidence, testified that he was doing four or five different types of things at once. That's one potential source of the contamination. And the prosecution suggested that the other was a follicular tag from the unknown foreign pubic hair, but the evidence is that a follicular tag from a hair that falls out naturally will not be present. So that's a very unlikely source of contamination. The much more likely source is sloppy handling of the evidence. That evidence does not tie Mr. Boland to this crime scene, and no physical evidence did. The final point that I want to make has to do with harmless error and the conversation that Judges Fletcher and Smith were having. Normally, when we look at harmless error, we do not reimagine the whole trial. We just take out the offending evidence and we look at what's left. In this case, I think the unusual thing is that not all of Cierbag's testimony offends the Constitution. So we don't have to take out his testimony about finding the victim, for example, about what he saw the morning of the offense. But we take out his identification, and I think that's the confusion there. It's because some of his testimony violates the Constitution and some does not. Okay. Any further questions from the bench? No. Okay. Thank both attorneys for very good arguments on both sides. The case of Boland v. Baker is now submitted for decision, and we are in adjournment.
judges: W. Fletcher, Paez, M. Smith